IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CHARLES HUDSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 1:12cv768-CSC |
| ) | (WO) |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

**I.  Introduction**

The plaintiff applied for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq*., and supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq*., alleging that he was unable to work because of a disability.  His application was denied at the initial administrative level. The plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ").  Following the hearing, the ALJ also denied the claim.  The Appeals Council rejected a subsequent request for review.  The ALJ's decision consequently became the final decision of the Commissioner of Social Security (Commissioner).[1]  *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  The case is now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3).  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

73.1, the parties have consented to entry of final judgment by the United States Magistrate Judge.  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be affirmed.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination,[2] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1)  Is the person presently unemployed?
> (2)  Is the person's impairment severe?
> (3)  Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)  Is the person unable to perform his or her former occupation?
> (5)  Is the person unable to perform any other work within the economy?
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

---

[2]  A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

[3] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI).  The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker,* 651 F.2d 408 (5th Cir. 1981) (Unit A).

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Substantial evidence is "more than a scintilla," but less than a preponderance: it "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004) (quotation marks omitted). The court "may not decide the facts anew, reweigh the evidence, or substitute . . . . [its] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004) (alteration in original) (quotation marks omitted).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III. The Issues

**A. Introduction**. The plaintiff was 48 years old on the date he applied for benefits (R. 126), and 49 years old on the date of the hearing before the ALJ. (R. 40). He has an eighth grade education. (*Id*.). Following the administrative hearing, the ALJ concluded that the plaintiff has the following severe impairments:

> alcohol dependence, major depressive disorder, panic disorder without agoraphobia, borderline intellectual functioning, coronary artery disease status post stent placement in left anterior descending artery, hypertension, hyperlipidemia, fatty liver with elevated liver enzymes, moderate restrictive pulmonary disease, remote history of pneumothorax, bilateral pulmonary

3

>     emboli, right shoulder arthritis or bursitis, left hand Dupuytren's contracture,
>     and decreased hearing due to hole in right ear drum

(R. 14). The ALJ determined that "[w]hen the claimant is not abusing alcohol, he has the residual functional capacity to perform less than the full range of "light work" as defined in 20 CFR 404.1567(b)." (R. 20). Following the hearing, the ALJ concluded that the plaintiff was unable to perform his past relevant work, but, using the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P., App. 2, as a framework and relying on the testimony of a vocational expert, he also concluded that there were significant number of jobs in the national economy that the plaintiff could perform. (R. 26-27). Accordingly, the ALJ concluded that the plaintiff was not disabled. (R. 27).

    **B. Plaintiff's Claims**. As stated by the plaintiff, he presents the following three issues for the Court's review:

>    1.    Whether the ALJ's finding of Mr. Hudson's residual functional capacity is inconsistent with her acceptance of the opinion of Dr. Vyas.
>
>    2.    Whether the ALJ erred in failing to properly consider the mechanics of Mr. Hudson's treatment.
>
>    3.    Whether the ALJ erred in finding alcohol material.

(Doc. # 12, Pl's Br. at 1).

## IV. Discussion

    A disability claimant bears the initial burden of demonstrating an inability to return to his past work. *Lucas v. Sullivan*, 918 F.2d 1567 (11th Cir. 1990). In determining whether the claimant has satisfied this burden, the Commissioner is guided by four factors: (1)

objective medical facts or clinical findings, (2) diagnoses of examining physicians, (3) subjective evidence of pain and disability, e.g., the testimony of the claimant and his family or friends, and (4) the claimant's age, education, and work history. *Tieniber v. Heckler*, 720 F.2d 1251 (11th Cir. 1983). The ALJ must conscientiously probe into, inquire of and explore all relevant facts to elicit both favorable and unfavorable facts for review. *Cowart v. Schweiker,* 662 F.2d 731, 735-36 (11th Cir. 1981). The ALJ must also state, with sufficient specificity, the reasons for his decision referencing the plaintiff's impairments.

> *Any* such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual *shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.*

42 U.S.C. § 405(b)(1) (emphases added).

**A. Materiality of alcohol on Plaintiff's claim**. Although the plaintiff complains about the ALJ's residual functional capacity, the crux of his claims involve the effect of his alcoholism on his ability to work.

A claimant "shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." PUB. L. NO. 104-121, § 105(a)(1), (b)(1), 110 Stat. 847, 852, 853 (codified as amended at 42 U.S.C. § 423(d)(2)(C) (1997)). The regulations implementing § 423(d)(2)(C) provide that once the Commissioner determines a claimant to be disabled and finds medical evidence of alcoholism, the Commissioner then "must determine whether ... alcoholism is a contributing

factor material to the determination of disability." 20 C.F.R. § 404.1535. The key factor in determining whether alcoholism is a contributing factor material to the determination of a disability (the "materiality determination") is whether the claimant would still be found disabled if he stopped using alcohol. *See* 20 C.F.R. § 404.1535(b)(1).

The ALJ is to determine which of the claimant's physical and mental limitations would remain if the claimant stopped alcohol. Then the ALJ must determine whether any of the claimant's remaining limitations would be disabling. 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2). If the ALJ determines that the remaining limitations would not be disabling, the ALJ must find that the claimant's "alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i). However, if the ALJ determines that the remaining limitations would be disabling, the ALJ must conclude that the claimant is "disabled independent of [his] . . . alcoholism and ... [his] . . . alcoholism is not a contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii).

The ALJ's approach in this case is wholly consistent with the law. She found the plaintiff disabled based on his mental impairments, including his substance use disorder. (R. 15). However, she also found that he would no longer be disabled if he ceased using alcohol.

> When the claimant is not abusing alcohol, his remaining limitations do not meet or medically equal the criteria of listings 12.04 or 12.06. The claimant's psychiatric condition is closely tied to alcohol abuse, and his psychiatric symptoms and functioning improve significantly when he is not drinking. The claimant has admitted on numerous occasions that drinking exacerbates his symptoms. . . . He also acknowledged to Dr. Meghani that "his primary problem has been alcohol, and he feels depressed when he does not have

> alcohol and he feels depressed when he is drinking." (Exhibit 7F).
>
> The records from the claimant's alcohol related hospitalizations demonstrate that his functioning improves when he is sober.

(R. 17).

The ALJ concluded that if the plaintiff stopped abusing alcohol, his remaining limitations would not meet the listings, his functioning would improve, and he would be able to perform work. (R. 17-26). Substantial evidence in the record supports the ALJ's conclusion that substance use is a contributing factor material to a determination of disability in this case. When Hudson applied for disability benefits, he candidly admitted that he had "an alcohol dependency." (R. 143). Hudson testified at the administrative hearing that he has not consumed alcohol since April or May 2009. (R. 43). On April 7, 2009, Hudson presented to the Dale Medical Center complaining of chest pain, shortness of breath anxiety and depression. (R. 273-275). At that time, radiology reports confirmed a bilateral pulmonary emboli. (R. 282). The records also noted that Hudson chronically abused alcohol even though Hudson reported that he had no alcohol for two months. (R. 274-75). On April 16, 2009, Hudson presented to Dr. Connie Chandler at the Ozark Medical Clinic for a follow-up appointment from his emergency room visit. (R. 257-58, 269-70). Hudson reported to Dr. Chandler that he stopped drinking three months earlier. (*Id.*)

On May 17, 2009, Hudson was admitted to the Dale Medical Center complaining of chest pain, and severe depression. (R. 294). At the time, he was severely depressed and possibly suicidal. (R. 295). He had also been drinking. "This patient has a long standing

history of alcohol dependence but drinks in binges and he informs me that he had been drinking for the past 7 days before he started to experience chest pain . . ." (R. 297). Hudson reported drinking a half gallon of alcohol daily. (*Id.*) Although he also reported that he was working, he complained that he was depressed, lacked motivation, and he lacked the "energy to even do his job that he enjoys." (*Id*). He was calm, cooperative and tearful during admission. (R. 298). His insight and judgment were fair but his affect was depressed and he expressed suicidal ideations. (*Id.*) Hudson was diagnosed as suffering from Major Depressive Disorder and Alcohol Dependence. (*Id.*) Because of the suicide risk, Hudson was admitted to the Behavioral Unit for in-patient treatment. (R. 299). Interestingly, an x-ray of his heart was normal as was his stress test. (R. 312). Hudson was discharged on May 18, 2009. (R. 439).

Hudson was admitted to the Southeast Alabama Medical Center on May 20, 2009 complaining of depression and alcohol dependence. (R. 430, 439-40). On admission, he reported that he had been "drinking a lot lately." (R. 440). Prior to his discharge on May 18, 2009, Hudson was showing "no signs of withdrawal symptoms, no mood or anxiety symptoms either." (R. 441).

> He was fully alert, orientation was fine, attention span was okay, thought process is goal directed, thought content was negative for hallucinations, delusions or paranoia. No suicidal ideation or homicidal thought. Mood was euthymic and affect was congruent, memory was okay for recent and remote, impulse control was good, insight and judgment were average, psychomotor activity within normal limits.

(*Id.*)

On May 20, 2009, Hudson called the Behavioral Unit at the hospital "acutely intoxicated with alcohol which was the case when he arrived at the Emergency Room." (R. 445). Hudson admitted drinking consistently since leaving the hospital. (*Id*.) "He does acknowledge . . . that his primary problem has been alcohol, and he feels depressed when he does not have the alcohol and he feels depressed when he is drinking." (*Id*.) On his arrival at the emergency room, he was experiencing delirium tremens ("DTs") and he had a seizure. (*Id*.) He remained hospitalized until May 31, 2009. (R. 442) At the time of his discharge, the medical notes reflect that his "confusion has not been that bad. He is still shaking and he [is] still nervous." (R. 446).

On June 7, 2009, Hudson was admitted to the Southeast Alabama Medical Center "secondary to significant auditory or visual hallucinations associated with chronic alcoholism and alcoholic liver disease." (R. 334). The medical records of this hospitalization demonstrate that Hudson was hospitalized due to his chronic alcoholism, and suffering from alcoholic withdrawal syndrome. (R. 336). Upon admission, Hudson went into the DTs. (*Id*.) He reported drinking a "half-gallon of vodka a day." (*Id*.) He was diagnosed with "Alcohol-induced psychosis." (R. 334). Although the medical records note that "[o]nce he (sic) acute alcohol withdrawal ceased, he continued to exhibit signs and symptoms of psychosis which appeared to be separate from his alcoholism," the records also indicate that Hudson "appeared to have significant degree of persistent alcoholic dementia." (*Id*.) Consequently, an out-patient placement was not possible, and Hudson was discharged to Searcy Hospital "for further psychiatric care there." (*Id*.)

Prior to his discharge to Searcy, psychiatric progress notes indicate that Hudson was improving. For example, on June 10, 2009, the psychiatric note reveals Hudson was improved, and on June 11, 2009, Hudson was doing well with no new complaints. (R. 356, 354). The psychiatric notes demonstrate that Hudson was consistently improving and was not psychotic. (R. 427-29). Upon his discharge from Southeast Alabama Medical Center, Hudson was exhibiting normal behavior. (R. 347). He was fully alert, with a good attention span and appropriate affect. (*Id*.)

On arrival at Searcy, Hudson admitted that he became suicidal when he drank. (R. 553). Psychiatric notes indicate that Hudson was cooperative and oriented; his concentration and attention were good; his insight and judgment were good; and his risk assessment was low. (R. 554-555). During his hospitalization at Searcy, Hudson was placed on anti-depressants. As a result, he stabilized and improved. (R. 558). He was released to a group home on August 25, 2009. (*Id*.)

When Hudson was discharged from Searcy to the group home, he began mental health treatment with SpectraCare. On September 1, 2009, his clinical assessment indicated that his mood was euthymic, his affect was appropriate, and his thought content, judgment and insight were appropriate. (R. 699). Treatment notes indicate continued improvement. (R. 698).

During his treatment with SpectraCare, Hudson participated in group therapy. (R. 676-690). From July 2010 until August 2010, Hudson visited family on three different occasions for a week each time, and one visit was a week and a half. (R. 688, 685, 680)

Beginning the week of August 23, 2010, Hudson failed to attend therapy. (R. 676). He returned to therapy the next week, (R. 674), but failed to return thereafter. (R. 663-670) Hudson left the group home, and was terminated from SpectraCare on December 8, 2010. (R. 662).

The medical evidence further demonstrates that since the alleged date of onset of disability, all of Hudson's hospitalizations have been the direct result of his alcoholism. (R. 273-75, 294-99, 439-46, 334-56, 427-29, 553-58).[4] When Hudson does not drink, and he takes his medication, he does not present to the hospital complaining of chest pain or depression. Thus, Hudson's medical records clearly indicate a history of alcohol dependence.

After thoroughly reviewing the evidence, the ALJ concluded that if Hudson stopped using alcohol, his difficulties in the areas of daily living, social functioning, and concentration, persistence or pace would improve. (R. 18-19). She acknowledged that

---

[4] Even prior to his date of onset of disability, Hudson had several alcohol related hospitalizations. For example, in July 2006, Hudson presented to Troy Hospital complaining of chest pain. At that time, he was also placed on a IV bag to avoid alcohol withdrawal symptoms. (R. 203). He reported then he was drinking "as much alcohol as I can get my hands on every day," and he had "consumed over a gallon of vodka in the last 24 hours." (R. 204). When he underwent a heart catheterization at Jackson Hospital, he reported drinking a pint of vodka each day. (R. 237).
    On January 22, 2007, Hudson presented to Jackson Hospital complaining of chest pain but hospital records note that he "smells of alcohol. admits to drinking a gallon of vodka today." (R. 227). His cardiac profile was normal. (R. 233).
    On May 14, 2008, Hudson presented to Dale Medical Center complaining of depression and anxiety. (R. 302, 321). Hudson was admitted after asking for help because he had been binge drinking four (4) pints of vodka. (R. 302).
    On December 1, 2008, Hudson again presented to Dale Medical Center complaining of anxiety. He admitted he had been drinking a half-gallon of vodka daily for 10 to 12 days without eating. (R. 290). He was diagnosed with acute alcohol intoxication and hallucinations. (*Id.*) At that time, he had no chest pain or shortness of breath. (*Id.*)

Hudson would have moderate restrictions but opined that he would no longer meet the Listings and he could perform work. (*Id*.). The record support the ALJ's determination.[5]

In addition, the ALJ considered Hudson's living arrangements and treatment while at the group home. *See* Doc. # 18. Relying on the function report Hudson completed while living at the group home, the ALJ found that

> . . . the claimant has mild restrictions in activities of daily living when he is not abusing alcohol. On October 12, 2009 (less than one month after being discharged from Searcy), the claimant completed a Function Report indicating that he was taking care of his own bathing and grooming, that he was preparing meals on a weekly basis, that he was participating in group home functions, and that he was reading and watching television for leisure. (Exhibit 5E). He reported that he was doing his own laundry twice a week, and that he was able to do so without encouragement. (*Id*.) He reported that he left his group home several times a day, and that he was able to go out alone. (*Id*.) On September 1, 2009, he advised his SpectraCare therapist that he was interested in leisure pursuits such as golf and fishing. (Exhibit 16F). The claimant testified that he is not currently drinking and his activities of daily living include preparing simple meals, taking care of his personal needs, assisting his mother with grocery shopping, and performing household chores such as laundry, ironing, sweeping, taking the trash, out making beds, and washing dishes. (Hearing testimony). He testified that he attends Alcoholics Anonymous Meetings, visits his children every week, and attends church once a week.

---

[5] The plaintiff argues that because Hudson was only drinking for two months during the relevant period, his alcoholism could not be a contributing factor material to his disability. *See* Doc. # 12 at 11-12. At first glance, the argument is appealing, but analysis shows that its major premise is incorrect, because the plaintiff relies on the lack of alcohol in his system during his last hospitalization as evidence that his alcoholism was not a contributing factor material to his disability. According to Hudson, because all alcohol would have metabolized out of his system within 3.53 hours of his admission to the hospital in June 2009, the fact that he remained hospitalized for approximately 13 days and was transferred to Searcy Hospital demonstrates that he suffers from psychosis separate from his chronic alcoholism. (*Id*. at 12). The plaintiff's reliance is misplaced. The medical records clearly demonstrate that Hudson's hospitalizations all stem from his chronic alcoholism. His diagnosis on discharge was Alcohol-induced psychosis. (R. 334). He was diagnosed as suffering from alcohol withdrawal syndromes and the DTs. (R. 336-40, 445, 334). Finally, occupational therapy notes from June 9, 2009 until June 17, 2009 do not reflect that Hudson was psychotic. (R. 427-29). In fact, with respect to reality orientation, Hudson was alert and oriented. (*Id*.)

(R. 18)

The ALJ further considered that he was able to leave the group home several times during the day for different reasons. (R. 18). The ALJ considered the effects of Hudson's treatment and living arrangements on his ability to perform work. Thus, to the extent that Hudson contends that the ALJ failed to consider "the mechanics of [his] treatment," he is simply wrong.[6] Pursuant to the substantial evidence standard, this court's review is a limited one; the entire record must be scrutinized to determine the reasonableness of the ALJ's factual findings. *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992). The ALJ's findings meet the reasonableness standard.

**B. Residual Functional Capacity ("RFC") Assessment**. The plaintiff alleges that the ALJ's RFC finding is inconsistent with her acceptance of the opinion of Dr. Vyas. *See* Doc. # 12 at 6.

The ALJ determined that the plaintiff could perform work at less than the full range of light work. (R. 20). Specifically, the ALJ concluded that

> [h]e can lift and carry up to 20 pounds occasionally and 10 pounds frequently. He can sit up to eight hours in an eight-hour workday, and he can stand and walk up to six hours in an eight-hour workday. He is limited in his ability to perform overhead reaching, and he is unable to work around dangerous equipment. He can perform simple, routine, and repetitive type tasks, but he

---

[6] Even if the ALJ erred, at this juncture, the error was harmless. "While the ALJ could have been more specific and explicit in [her] findings, [s]he did consider all of the evidence and found that it did not support the level of disability [Hudson] claimed." *Freeman v. Barnhart*, 220 Fed. Appx. 957, 960 (11th Cir. 2007). The ALJ considered that Hudson "has been functioning outside of a highly supportive living arrangement since August of 2010, and he is able to leave the area of his home without significant difficulty." (R. 19). Thus, the court concludes that even if the Commissioner's failed to refer to the specific mechanics of Hudson's treatment, any error was harmless. *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying harmless error analysis in the Social Security case context).

is limited to only occasional contact with the general public.

(R. 20).

According to the plaintiff, "the ALJ's decision is not based on substantial evidence because the ALJ's finding of Mr. Hudson's RFC focuses on some aspects of Dr. Vyas' opinion but disregards other aspects of Dr. Vyas' opinion." (Doc. # 12 at 6-7). In particular, the plaintiff complains that the ALJ's RFC is less restrictive than portions of Dr. Vyas' RFC and the ALJ failed to explain why she did not accept all of the Dr. Vyas' restrictions. (*Id*. at 7-8).

On March 6, 2011, Hudson underwent a consultative physical evaluation by Dr. Vijay Vyas. The examination revealed the following.

> The neck movements are completely normal. The rotation of the neck and the lateral movements are normal. The left shoulder is normal. The right shoulder, he has some anterior tenderness and he has pain on raising the arm above the shoulder about 110-120 degrees and it is slightly painful. The elbows both are normal. The right wrist, fingers and hand are normal. The left wrist is normal, it has vague tenderness but nothing very remarkable. The movement of the wrist is normal. The left hand, the patient has Dupuytren's contractures on the ring finger and he has some tenderness with partial contracture of the ring finger but I can extend it all the way passively but he says it hurts. He can open and close his fingers but he says it hurts so he tries not to open and close too much. There is no tenderness of the lumbar spine. The knees, hips, ankles, feet, calf and thigh are normal. The leg raising is normal. The gait is normal. He can walk on the toes and heels. He can bend forward, backward, sideways and squat without any pain or restriction.

(R. 716)

Dr. Vyas then completed a medical source statement in which he opined that Hudson could lift and carry up to twenty (20) pounds continuously and occasionally carry up to fifty

(50) pounds. (R. 722). Without interruption, he could sit for four (4) hours, stand for two (2) hours, and walk for one (1) hour. (R. 723). During an eight (8) hour work day, Hudson could sit for a total of eight (8) hours, stand for six (6) hours, and walk for three (3) hours. (*Id*.) Dr. Vyas also opined that Hudson could frequently or continuously use both hands except Hudson was limited to only occasionally using his left hand to push/pull. (R. 724). Finally, Dr. Vyas determined that Hudson could frequently climb stairs, ramps, and ladders, balance, stoop, kneel and crouch but could only occasionally crawl. (R. 725).

The plaintiff argues that "the deviations between Dr. Vyas' opinion and the ALJ's finding of Mr. Hudson's RFC are significant" because Dr. Vyas opined that Hudson could only walk for three hours a day which is inconsistent with the definition of light work and significantly limits the work Hudson can perform. (Doc. # 12 at 7-8). The ALJ clearly considered Dr. Vyas' medical source statement when she found that Hudson could "*stand and walk up to six hours*" a day.[7] *Compare* R. 20 to R. 723 (emphasis added). The ALJ's RFC is not inconsistent with Dr. Vyas' opinion.

Moreover, light work is not limited by how long a claimant can stand during the work day. Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "[A] job is in this category *when* it requires a good deal of walking *or* standing, *or* when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id*. (emphasis

---

[7] The plaintiff also complains that the ALJ failed to consider Dr. Vyas' opinion that Hudson was limited to occasional exposure to dust, odors and pulmonary irritants. (R. 726). The plaintiff is simply wrong. *See* R. 25. The ALJ considered this aspect of Dr. Vyas' medical source statement.

added). Contrary to the plaintiff's assertion, a finding that Hudson can perform light work does not equate to a finding that he must also be able to walk for more than three (3) hours. The regulation clearly delineates that "*when* a job requires a good deal of walking *or* standing," then it may rise to the level of light work. The fact that the ALJ concluded that Hudson could perform less than a full range of light work does not correlate to a finding that he must also be able to stand for more than three (3) hours.

More importantly, however, it is the ALJ's duty to determine the plaintiff's residual functional capacity based on all the evidence of record; she is not required to rely solely on a physician's assessment. "The residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments. 20 CFR § 404.1545(a). Along with his age, education and work experience, the claimant's residual functional capacity is considered in determining whether the claimant can work. 20 CFR § 404.1520(f)." *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997). The ALJ evaluated all the evidence before her which led her to conclude that the plaintiff can perform less than a full range of light work. It is not the province of this court to reweigh evidence, make credibility determinations, or substitute its judgment for that of the ALJ. Instead the court reviews the record to determine if the decision reached is supported by substantial evidence. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). After careful examination of the administrative record, the court concludes that the ALJ's residual functional capacity is consistent with the medical evidence as a whole as well as Hudson's testimony about his impairments and abilities. In short, the court concludes that substantial

evidence supports the conclusion of the ALJ concerning Hudson's residual functional capacity to perform work.

To the extent that Hudson argues that the ALJ should have accepted Dr. Vyas' opinions regarding his abilities, the ALJ may disregard the opinion of a physician, provided that she states with particularity reasons therefor. *Sharfarz v. Bowen*, 825 F.2d 278 (11th Cir. 1987). In this case, the ALJ considered Dr. Vyas' assessment of Hudson's ability to work, but discounted some aspects of his opinion. (R. 25).

> The opinions of Dr. Vyas have generally been given great weight because they are consistent with the longitudinal record including the objective medical evidence and the claimant's daily activities. However, the suggestion that the claimant can only occasionally push and pull with his left arm has been given little weight because it is inconsistent with the record including Dr. Vyas' own observation that the claimant's left shoulder movement was normal and that his left upper extremity strength, reflexes, and sensation were all normal. Likewise, his opinion that the claimant can only occasionally crawl is inconsistent with his observation that the claimant had a normal neurological examination with normal strength, sensation, and reflexes in all areas; that he had a negative straight leg raise test; and that he was able to squat and bend without limitation.

(R. 25).

Only after considering all the medical records, did the ALJ discount a portion of Dr. Vyas' opinion as inconsistent with his own examination notes. Based upon its review of the ALJ's decision and the objective medical evidence of record, the court concludes that the ALJ properly rejected Dr. Vyas' opinion regarding Hudson's ability to crawl and push and pull with his left hand.[8]

---

[8] In addition, the medical records indicate that Hudson was treated by Dr. Rasmussen from 2009 until 2010. (R. 645-658). During that time, Hudson did not complain about **left** hand pain or problems with

## V. Conclusion

The court has carefully and independently reviewed the record and concludes that substantial evidence supports the ALJ's conclusion that plaintiff is not disabled. Thus, the court concludes that the decision of the Commissioner is supported by substantial evidence and is due to be affirmed.

A separate final judgment will be entered.

Done this 17th day of September 2013.

                                        /s/Charles S. Coody
                                        CHARLES S. COODY
                                        UNITED STATES MAGISTRATE JUDGE

---

his joints that would inhibit his ability to crawl. Although Dr. Rasmussen was monitoring Hudson's Coumadin levels, treatment records reflect other treatment. For example, on September 16, 2009, Hudson denied any pain or joint stiffness. (R. 645). On November 11, 2009, Hudson complained of pain in his right shoulder. (R. 648). On January 11, 2010, Hudson complained that his right shoulder was worsening. (R. 650). However, on May 6, 2010, Hudson denied any musculoskeletal symptoms, joint stiffness or joint pain. (R. 653).